## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| **MICHELLE GIESE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | **Case No.  19-CV-1245** |
| | ) | |
| **LT. NATHAN BOYCE, CHIEF DAMON** | ) | |
| **SCHULDT, and CITY OF KANKAKEE,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |

## <u>ORDER</u>

Plaintiff, Michelle Giese, filed on July 18, 2019, a Complaint (#1) against Defendants Nathan Boyce, Damon Schuldt, and the City of Kankakee ("the City"). In the Complaint, Plaintiff alleged that Schuldt and the City discriminated against her on the basis of her sex in violation of the Fourteenth Amendment, 42 U.S.C. § 1983, and Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.). She also alleged that the City engaged in retaliatory conduct under Title VII and that both Schuldt and the City were liable for violations of her rights under the United States Constitution because those violations were the result of the policies and customs of the City and of the Kankakee Fire Department ("KFD").

This court earlier dismissed Counts VII and VIII of the Complaint in their entirety, as well as Count XIII with respect to Schuldt and the City (#31).

Presently before this court are a Motion for Summary Judgment (#44) filed by Schuldt and the City on October 18, 2021, and Motion for Summary Judgment (#46) filed by Boyce on October 22, 2021. Plaintiff filed a combined Response (#52) to those motions on December 29, 2021. Schuldt and the City (#53) and Boyce (#54) each filed a Reply on January 7, 2022.

For the reasons set forth below, summary judgment is GRANTED in favor of Schuldt and the City with respect to the five claims in the Complaint arising out of federal law: Counts I, II, III, XI, and XII. The court relinquishes supplemental jurisdiction over the remaining claims arising under state law and thus dismisses without prejudice Counts IV, V, VI, IX, X, XIII, XIV, XV, and XVI of the Complaint.

## BACKGROUND

The instant Complaint arises from an October 18, 2018, incident in which Plaintiff was physically accosted by Boyce while they were responding to a fire call. Both Plaintiff and Boyce were then and at all relevant times lieutenants in the KFD. Plaintiff is a woman. Schuldt was appointed chief of the KFD in 2017 and was in that position at all relevant times. The City is a municipality duly incorporated under Illinois law and was at all relevant times the employer of each of the other parties.

*Mertens Fire*

In the late afternoon hours of October 18, 2018, the KFD was informed of a fire on the second floor of a senior living facility located at 155 W. Mertens Street. Plaintiff, Boyce, Lance Keller, Tim Johnson, Mike McCully, and Tom Rabourn were among the KFD firefighters who responded to the call. McCully was first at the scene. He reported

that the second-floor hallway was "untenable" beyond a set of fire doors, meaning the hallway was smoke-filled or dangerous in a way that made it difficult for firefighters to navigate. The fire doors had windows, which allowed McCully to observe the hallway beyond.

Upon arriving at the scene, Boyce took command of operations on the second floor. Plaintiff and Rabourn brought a fire hose to the second floor. A group composed of at least Plaintiff, Boyce, McCully, Keller, and Johnson convened on that floor just outside of the fire doors. Boyce intended to proceed through the fire doors once the hose was "charged," or filled with water. He testified that he relayed orders along those lines. Plaintiff and McCully testified that they were unaware of such orders; Keller testified that Boyce did order that the fire doors not be breached until the hose was charged.

Upon further examination of the conditions beyond the fire doors, Plaintiff and McCully determined that the situation was not as untenable as originally thought. Through the use of thermal imaging technology, they determined that the fire was located in Unit 207, the first apartment on the left beyond the fire doors. Plaintiff, McCully, Keller, and Johnson carried the uncharged fire hose through the fire doors and toward Unit 207. Upon hearing moans coming from inside that apartment, the group dropped the hose and proceeded into the apartment. Once inside, McCully, Keller, and Johnson moved into the living room area to assist an elderly woman who had caught on fire. Plaintiff remained slightly behind that group, in the entrance hallway of the apartment, searching for the source of the fire.

3

Meanwhile, Boyce testified that he was assisting Rabourn in "flaking out" or unkinking the fire hose so that it could be charged, when he noticed that Plaintiff and the others had proceeded through the fire doors toward Unit 207. Boyce pursued the them down the hallway in an effort to "slow them down a little bit." Boyce saw that the group had abandoned the hose and had proceeded into Unit 207. When he reached Unit 207, Boyce saw Plaintiff in the entry hallway and McCully, Keller, and Johnson further inside the apartment.

Plaintiff testified that Boyce then grabbed her by the harness, spun her around, and pushed her into a wall. Boyce forced her up the wall to the point that her boots were off the ground. When she slid down the wall such that her boots were once again on the floor, Boyce pushed her against the wall two more times. On each occasion, Boyce pushed her into the wall, pulled her back by holding her harness, and pushed her into the wall again. Boyce was yelling something incomprehensible as he did so. Momentum from the altercation pushed Plaintiff and Boyce into a separate hallway within the apartment, where he pushed her three more times.

Boyce testified that he only grabbed Plaintiff's harness and turned her around. He denied pushing her into a wall. McCully testified that he saw Plaintiff up against a wall with Boyce holding his arm across her shoulders. Johnson saw Plaintiff up against a wall while Boyce held her coat. He saw Boyce "kind of pull back then go back forward." Keller heard Boyce and Plaintiff exchanging heated words about the fire hose but could not see them. After Boyce relented, Keller, McCully, and Johnson carried the elderly victim out of the room.

4

Rabourn's location before and during the altercation is an area of dispute. Plaintiff testified that Rabourn was with her, McCully, Keller, and Johnson when proceeding down the hallway with the uncharged hose. According to Plaintiff, Rabourn was "near the apartment doorway" when Boyce entered. Plaintiff did not know this until Boyce forcefully turned her around, at which point she saw Rabourn. Prior to that, she had been looking into other rooms in the apartment.[1] Keller testified that Rabourn proceeded down the hallway with the lead group, though at the rear. He did not know if Rabourn ever entered Unit 207. Boyce testified that Rabourn had been with him flaking out the hose, Rabourn followed behind him when Boyce proceeded to Unit 207, and Rabourn remained behind him when Boyce entered the apartment.

Rabourn's testimony aligned with that of Boyce. He testified that he was unkinking the fire hose and was not a part of the group that proceeded down the hallway with the uncharged hose. Rabourn testified that he did not see the altercation between Boyce and Plaintiff and was not in Unit 207 or its doorway when it happened. Similarly, McCully testified that only he, Plaintiff, Keller, and Johnson were on the fire hose. His deposition included no reference at all to Rabourn. Johnson did not indicate where Rabourn was during the events in question.

Plaintiff believed that Boyce targeted her because Boyce would have had to walk past Rabourn to get to her. Plaintiff originally testified in her deposition that she

---

[1] In a written statement composed shortly after the incident, Plaintiff described Rabourn as originally behind her, "stretching the line" with Boyce. In later describing the procession to Unit 207, Plaintiff's statement did not specifically indicate whether Rabourn was or was not with the group.

5

believed she was targeted because she was the only lieutenant in the room. Later, she

testified that she believed she was targeted by Boyce both because of her rank and

because she is a woman.  Boyce testified that his primary intent when he entered Unit

207 was "trying to get the attention of the first person that I came to within the

apartment to redirect them back to the hoseline." Keller believed that Boyce was angry

because his order regarding the charging of the fire hose had been ignored.

*Aftermath and Investigation*

While still at the scene of the Mertens fire, Plaintiff told Deputy Chief Jeffrey

Bruno what had happened between her and Boyce. Bruno requested that all of the

involved parties make written statements. Over the ensuing two days, Plaintiff

informed Union Secretary Don Fordahl and Union Vice President David Kruse of the

incident at the Mertens fire. She testified that, by that point, the incident had already

become "department knowledge."

Schuldt met "informally" with Plaintiff on October 22 and 25, 2018. Schuldt

assured Plaintiff that he would not take the matter lightly and that Boyce would be

disciplined. He informed her that there would be an investigation. Plaintiff testified that

Schuldt told her she should not be around Boyce. While Plaintiff was not scheduled on

the same shift as Boyce, she had made two "trades" for shifts in November that would

have resulted in her working the same shift as Boyce. According to Plaintiff, Schuldt

requested that Plaintiff "amend" those trades. He stated that he did not want to

"cancel" the trades but preferred that Plaintiff make the arrangements herself. Schuldt

testified that he merely gave Plaintiff the option of rescinding the trades, because he did

6

not want Plaintiff to feel as though she was being forced to work on the same shift as Boyce.

On October 25, 2018, Schuldt met with Bruno, Union President David Moy, Kruse, and Fordahl to discuss how to handle the situation, including the discipline to be imposed on Boyce. Schuldt had never dealt with an incident of this nature and wanted input from the union leadership. It was Fordahl's understanding that, by the end of that meeting, Schuldt had elected to put Boyce on administrative leave pending a full investigation. Schuldt denied ever considering administrative leave.

On October 26, 2018, Boyce appeared at a disciplinary hearing in front of Schuldt and Bruno. Union representatives Kruse, Fordahl, and Chris Wolfe were also present. The hearing was held in Schuldt's office. Boyce explained his side of the story. Boyce attempted to justify his actions, but Schuldt became angry and told Boyce he had "an issue that needs to get fixed."

On November 1, 2018, Boyce was suspended for three days, or 24 hours of work, without pay and was instructed to complete an anger management course. Boyce was also instructed to not work on Plaintiff's shift for three months. The formal suspension letter indicated that further violations of KFD rules could lead to further discipline, including termination.

Moy, Kruse, and Fordahl believed that the punishment had been relatively light. Even Boyce believed he was going to be placed on administrative leave. Schuldt commented to Fordahl that he did not believe the matter "needed to go to the police and fire commission," a requirement for suspensions of more than 48 hours. Kruse

noted that that the union leadership was in a "predicament," as representatives of both Boyce and Plaintiff. He believed that complaining to Schuldt that Plaintiff's punishment was insufficient would be inappropriate.

Schuldt requested that City Investigator Ron Bartlett investigate the Mertens fire incident. Bartlett testified that the request was made after Boyce had received his discipline. Bartlett interviewed all of the involved parties, including Boyce on November 1, 2018, and Plaintiff, on November 8, 2018. The results of the investigation were compiled in a report given to the City's human resources department. Bartlett concluded that Boyce had not "singled out" Plaintiff, but rather accosted the first person he saw in the apartment. More specifically, Bartlett opined that Boyce's actions "seemed to reflect the reactions of a situation commander who was unwilling or unable to accept that a decision was made by subordinate personnel which contracted his previous stated commands." Plaintiff asked Schuldt on multiple occasions for a copy of Bartlett's report. Schuldt informed her that he could not give her a copy of the report but did not tell her the reason.

On November 4, 2018, Plaintiff began using personal sick time because of psychological trauma arising from the incident with Boyce. Plaintiff explained that she had lost the ability to focus and felt like she was in cognitive decline. She was also suffering from panic attacks, nausea, vomiting, and diarrhea. On November 15, she put in a worker's compensation request for coverage of those injuries. On December 13, that request was granted, and the sick time that she had used beginning on November 4 was credited back to her.

On November 5, 2018, Plaintiff contacted the head of human resources for the city, Elizabeth Kubal. She explained that she "wasn't getting anywhere with the fire chief" and requested that the matter be referred to human resources. Plaintiff was frustrated that she had been asked to "work around" Boyce's schedule and that she had not been interviewed by Schuldt or the union board in relation to the incident. Kubal subsequently called Schuldt and suggested he talk to Plaintiff. Schuldt called Plaintiff soon thereafter and asked why Plaintiff had contacted human resources. When Plaintiff explained that she was mentally and emotionally exhausted, Schuldt replied, according to Plaintiff, "it's a good thing it's all over then."

On March 13, 2019, Plaintiff visited a firehouse to return a book. She was informed by Captain Michael Casagrande that Schuldt had instructed "the supervisors" to not speak with her because she had retained an attorney and there was a "pending lawsuit."[2] Schuldt testified that James Ellexson—who succeeded Kubal as the City's director of human resources—had suggested that Schuldt and Bruno, as chiefs and administrators of the KFD, not communicate directly with Plaintiff, and instead leave such communication to Ellexson.

---

[2] There was no pending lawsuit at that time.

*Plaintiff's Return to Work*

At some point in early 2019, Plaintiff's personal therapist Sarah Gura recommended that Plaintiff not return to work. The City's third-party worker's compensation vendor, however, required documentation from an actual medical doctor.

The worker's compensation provider requested that Plaintiff see psychiatrist Dr. Nancy Landre. Dr. Landre evaluated Plaintiff on February 27, 2019. Separately, Gura referred Plaintiff to psychiatrist Dr. Victoria Reid, who evaluated Plaintiff on February 28 and March 12.

Dr. Landre concluded that Plaintiff had preexisting conditions that were exacerbated by the encounter with Boyce. Dr. Landre opined that Plaintiff was presently incapable of "resuming full duty work as a firefighter," but was capable of "working in a light duty capacity."  Dr. Reid found that Plaintiff had preexisting anxiety and depressive disorder, which was aggravated by the incident with Boyce. Dr. Reid reported that Plaintiff would be capable of working a "desk position" as long as it did not involve any "life or death decision-making." At the time, Plaintiff agreed with Dr. Reid's conclusion.

On March 25, 2019, Ellexson, informed Plaintiff that "they were working on a return to work date" for her. Ellexson told her that the plan would include "light" or "alternate" duty. Plaintiff was aware of other firefighters who had temporarily been assigned to light duty during her tenure at the KFD and generally understood what the term meant.

Ellexson and Plaintiff spoke by phone again on April 12, 2019. Plaintiff alleged in her Complaint that in this conversation, Ellexson told her she would be terminated if she did not return to work by April 15.[3] She testified that Ellexson also told her she "could not continue working with Gura, that it wouldn't be approved."  Ellexson denied threatening to terminate Plaintiff. He also testified that he did not tell Plaintiff that she could not work with Gura, but merely that the worker's compensation vendor would not accept documentation from Gura because she was not a doctor.

Plaintiff returned to light duty on April 14, 2019. In the two prior weeks, Plaintiff had been charged with using 120 hours of her personal sick time. That time was credited back to her when she reported to work on the 14th. Ellexson described "light duty" as a non-permanent position that an employee takes while they heal from their injuries. Plaintiff described light duties as "cooking, cleaning, [and] clerical."

On the day Plaintiff returned to light duty, Casagrande asked her to assist in an active fire investigation. Plaintiff informed him that she had work restrictions as part of light duty. Casagrande was taken aback, as Schuldt had not informed him of Plaintiff's restrictions. Ellexson testified that telling other KFD employees about Plaintiff's work restrictions would have been a violation of HIPAA. Neither Casagrande nor any other supervisor ever insisted or required that Plaintiff do any tasks she was restricted from doing.

---

[3] Plaintiff did not testify in her deposition that Ellexson threatened to terminate her and has not otherwise provided any evidence of such a threat.

On April 5, 2019, Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). In the complaint, Plaintiff alleged that she had been subjected to harassment and different terms of employment based on her sex. She alleged that he injuries included "having the submission of paperwork delayed."

On April 30, 2019, Plaintiff had a meeting with Schuldt, Ellexson, Bruno, and Fordahl.[4] Ellexson had suggested that Schuldt or Bruno compile a formal list of tasks that could be completed while on "light duty." The meeting was held to discuss that list. Plaintiff testified that Schuldt rolled his eyes at her during that meeting. Schuldt recalled that Plaintiff became increasingly agitated over the course of that meeting and eventually announced that she was leaving the meeting and work.

Plaintiff left her light duty position on May 10, 2019, and has not returned to work since. According to her Complaint, Plaintiff had to be sent home that day because she broke out in hives and blisters and had an elevated blood pressure. Plaintiff applied for a disability pension in November 2019, an application that remained pending as of her November 2020 deposition. At the time of her deposition, Plaintiff was receiving bi-weekly payments that she characterized as worker's compensation.

---

[4] Schuldt testified that this meeting occurred on May 10, 2019.

12

*Boyce's History*

Boyce had been working in the KFD for more than 12 years at the time of the Mertens fire incident. Plaintiff and Boyce had a close personal friendship spanning at least 10 years, beginning when Plaintiff was originally hired by the KFD in 2007 or 2008. They had gone out on numerous fire service calls together without incident.

Multiple KFD employees testified in some form to Boyce's short temper or anger issues. Johnson observed that Boyce could be "occasionally irritable [and] short-fused." Fordahl opined that Boyce has a tendency toward "verbal aggression." Kruse testified that Boyce had a "very quick temper" that "sometimes came out of nowhere." Plaintiff had seen Boyce lose his temper on a number of occasions. She characterized Boyce as "a ticking timebomb," and asserted that Boyce's anger issues were "department knowledge." Johnson agreed that Boyce's temper was "common knowledge." Multiple KFD employees described Boyce as passionate about firefighting, a passion that sometimes manifested as anger when things were not done correctly. Boyce himself acknowledged that he could be a "hothead."

Plaintiff recalled occasions on which Boyce would become so intoxicated that other people attempted to get his car keys from him. In that situation, Plaintiff had seen him push and shove others, including herself once. Still, she testified that Boyce had never directed any intimidation or anger toward her. Kruse also recalled Boyce getting "physical" with people when they tried to prevent him from driving. Boyce agreed that he had become upset on occasions that people had asked for his keys, because he did not think it was necessary. He denied ever becoming physically aggressive in those

13

instances. Other than the occasions regarding his car keys, no deponent could recall any instance in which Boyce became physically violent with another person.

Two specific instances of Boyce's anger manifesting were recounted by multiple witnesses. In the first incident, Boyce accidentally bumped his elbow in the firehouse and violently slammed his helmet to the ground in frustration. In the second, Boyce launched into an expletive-filled tirade against Moy when he was displeased with Moy's actions in his role as Union President.

In January 2014, Boyce's ex-girlfriend, Jennifer Gessner, petitioned for an order of protection against him. The petition listed both Gessner and her son as petitioners. On one part of the form, a box corresponding to respondent (Boyce) having "a history of violence" was checked. In the narrative, Gessner wrote that Boyce "got aggressive" with her while intoxicated at a restaurant, more than a month prior to the application. In his deposition, Boyce agreed that he "confronted" Gessner in a restaurant after he "had a few drinks." The circuit court ultimately granted an emergency order of protection.

## ANALYSIS

Following this court's order on the parties' motions to dismiss, 14 counts remain pending. Five of those remaining counts—each against Schuldt, the City, or both—are raised under federal law. Plaintiff's federal claims are: sex discrimination in violation of Equal Protection under 42 U.S.C. § 1983 (Count I); *Monell*[5] claims based upon violations of her rights under the Second, Fourth, and Fourteenth Amendment (Counts II and III);

---

[5] *Monell v. Dep't of Social Services of the City of New York*, 436 U.S. 658, 694 (1978).

sex discrimination in violation of Title VII of the Civil Rights Act of 1964 (Count XI); and retaliation in violation of Title VII (Count XII).

Plaintiff also raises numerous Illinois state law claims. With respect to Schuldt and the City, those claims are: intentional infliction of emotional distress (Counts V and VI); violation of the Illinois Gender Violence Act, 740 Ill. Comp. Stat. 82/1 et seq. (Count X); conspiracy (Count XIV); and indemnification against the City (Counts XV and XVI). Plaintiff's state law claims against Boyce are: intentional infliction of emotional distress (Count IV); assault and battery (Count IX); violation of the Illinois Gender Violence Act (Count X); gross negligence (Count XIII), and conspiracy (Count XIV).

### I. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court is tasked with deciding, based on the evidence of record, whether there is any material dispute of fact that requires a trial. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Summary judgment is appropriate only where the evidence is such that no reasonable jury could return a verdict in the nonmovant's favor. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). In other words, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

However, the court's favor toward the nonmoving party does not extend to drawing inferences that are only supported by speculation or conjecture. *Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008). Likewise, the court "need not accept as true a plaintiff's *characterization* of the facts or a plaintiff's legal conclusion." *Nuzzi v. Nguyen*, 2009 WL 1409703, at *8 (C.D.Ill. May 20, 2009).

The party opposing summary judgment may not rely on the allegations contained in the pleadings. *Waldridge*, 24 F.3d at 920. "[I]nstead, the nonmovant must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004) (quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003)). To survive summary judgment, the nonmoving party "must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007).

## II. Sex Discrimination Claims (Counts I and XI)

Plaintiff alleges in Count I that Schuldt and the City deprived her of the equal protection of law, in violation of the United States Constitution and 42 U.S.C. § 1983, by intentionally subjecting her to discriminatory treatment based on her sex. She alleges that the discriminatory treatment included improperly disciplining Boyce, requiring Plaintiff to switch her own schedule to avoid working with Boyce, failing to formally meet with or interview her regarding the incident, delaying the submission of medical

16

paperwork, and requiring Plaintiff to return to duty "over the objection of her doctors." Plaintiff also alleges that Schuldt and the City created a hostile work environment.

In Count XI, Plaintiff alleges that the City subjected her to different terms and conditions of employment on the basis of her sex, in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.). Specifically, she alleges that she was treated less preferably than similarly situated male employees, through "discriminatory job assignments, disparate terms and conditions of employment, discriminatory restrictions on her employment[,] and other forms of discrimination in violation of Title VII."

It is well settled that claims of equal protection violations under § 1983 and claims of discrimination under Title VII are subject to the same standards and analytical framework. *Williams v. Seniff*, 342 F.3d 774, 788 n.13 (7th Cir. 2003); *Burks v. Wisc. Dept. Transp.*, 464 F.3d 744, 751 n.2 (7th Cir. 2006). Accordingly, this court will consider Counts I and XI in conjunction.

In order to avoid summary judgment on a claim of sex discrimination, a plaintiff must present evidence that would permit a reasonable jury to conclude that the plaintiff's sex caused the discharge "or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). One avenue for making the required showing is through the burden-shifting framework introduced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under the *McDonnell Douglas* approach, the plaintiff bears the initial burden of making a prima facie showing of sex discrimination. *Cheek v. Peabody Coal Co.*, 97 F.3d 200, 204 (7th Cir. 1996).

17

"To do so, she must show that (1) she was a member of a protected class, (2) she performed her job satisfactorily, (3) she suffered an adverse employment action, and (4) her employer treated similarly situated males more favorably." *Id*.

The Seventh Circuit has made clear that the *McDonnell Douglas* test is not the sole means by which a plaintiff may make the required showing of discrimination. *Purtue v. Wisconsin Department of Corrections*, 963 F.3d 598, 601 (7th Cir. 2020). A plaintiff is "entitled to present any evidence he can muster to show that discrimination was the reason for the adverse action." *Hester v. Indiana State Department of Health*, 726 F.3d 942, 947 (7th Cir. 2013). Such evidence may include "suspicious timing, ambiguous statements or behavior directed at others in the protected group; and evidence that similarly situated employees outside the protected class were treated more favorably." *Id*. The ultimate question is whether the plaintiff has presented evidence that would permit a reasonable factfinder to conclude that the plaintiff's sex caused the discharge or other adverse employment action. *Khungar v. Access Community Health Network*, 985 F.3d 565, 573 (7th Cir. 2021).

A materially adverse employment action is a required element whether a plaintiff proceeds via *McDonnell Douglas* or otherwise. See *id*.; *Ortiz*, 834 F.3d at 765. "A cognizable adverse employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Chaudhry v. Nucor Steel-Indiana*, 546 F.3d 832, 838 (7th Cir. 2008) (cleaned up). The Seventh Circuit has made clear that "[w]hile adverse employment actions extend beyond readily

quantifiable losses, not everything that makes an employee unhappy is an actionable

adverse action." *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004). Adverse

employment actions generally fall into three categories:

> "(1) termination or reduction in compensation, fringe benefits, or other financial
> terms of employment; (2) transfers or changes in job duties that cause an
> employee's skills to atrophy and reduce further career prospects; and (3)
> unbearable changes in job conditions, such as a hostile work environment or
> conditions amounting to constructive discharge."

*Barton v. Zimmer, Inc.*, 662 F.3d 448, 453054 (7th Cir. 2011).

The latter of the three recognized categories of adverse employment actions gives

rise to the hostile work environment theory, which is often treated as a distinct claim.

*E.g.*, *Alamo v. Bliss*, 864 F.3d 541, 549 (7th Cir. 2017). As the Supreme Court has

explained, the phrase "terms, conditions, or privileges of employment" in Title VII

"evinces a congressional intent to strike at the entire spectrum of disparate treatment of

men and women in employment, which includes requiring people to work in a

discriminatorily hostile or abusive environment." *Harris v. Forklift Systems, Inc.*, 510 U.S.

17, 21 (1993) (cleaned up). Courts will therefore distinguish between "tangible" or

"discrete" employment actions — such as termination, demotion, failure to promote,

etc. — and hostile work environments created through the "cumulative effect of

individual acts." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) ("A

hostile work environment claim is composed of a series of separate acts that collectively

constitute one 'unlawful employment practice.'"); see also *Hall v. City of Chicago*, 713

F.3d 325, 330 (7th Cir. 2013).

A. <u>Tangible Adverse Employment Action</u>

Schuldt and the City argue, as a threshold matter, that Plaintiff has not shown that she suffered any adverse employment action. They observe that Plaintiff "was not fired, demoted, docked salary, or, during her time on light duty, required to do any task after saying that she could not." As Schuldt and the City address a hostile work environment theory elsewhere in their motion, it is clear that this initial argument is directed at a lack of tangible or discrete employment actions.

Plaintiff, in her Response, declines to address this particular argument. Thus, the court will attempt to discern for itself what, if any, tangible adverse employment action Plaintiff may have suffered.

Plaintiff's time on light duty ended on May 10, 2019; according to the complaint, Plaintiff was sent home that day due to continuing symptoms, including "hives on her face and neck, blisters under her armpits, and elevated blood pressure." Plaintiff testified that she applied for a disability pension in November 2019 and continued to receive bi-weekly worker's compensation payments. The record otherwise contains no details as to her precise employment status with the KFD. In any event, Plaintiff does not even allege that she was discharged, demoted, or suffered any self-evident employment action.

The court next turns to the various allegations raised against Schuldt and the City in Plaintiff's original EEOC filing, her complaint, or in her Response to the summary judgment motions.

20

Many of these allegations are unsupported by any evidence at this stage or have been abandoned. For instance, Plaintiff alleged in her Charge of Discrimination to the EEOC that she had suffered from "having the submission of medical paperwork delayed." She made a similar allegation in her Complaint. However, Plaintiff has provided no evidence concerning this allegation and makes no reference to it in her Response. Similarly, Plaintiff alleged in her Complaint that she was initially denied Public Employee Disability benefits; but she has presented no evidence of that fact and has apparently abandoned the claim.

Certain other of Plaintiff's allegations are affirmatively rebutted by her own evidence. For example, Plaintiff asserts in her Response that she was "den[ied] her benefits as an employee of Defendant City." But Plaintiff conceded in her deposition that each time she was required to use personal sick time—either in November 2018 or April 2019—it was subsequently credited back to her. Likewise, Plaintiff alleged in her Complaint and reasserts in her Response that she was denied a "formal interview" in the wake of the Mertens fire incident. Yet it is undisputed that Bartlett interviewed her on November 8, 2018.

Finally, Plaintiff alleges that the discipline levied against Boyce was insufficient, she was required to amend two shift trades to avoid working with Boyce, and that her supervisors were instructed not to speak to her. None of these events, however, can reasonably be construed as "a significant change in employment status." *Chaudhry*, 546 F.3d 832. Nor does Plaintiff argue that they were. The court will, however, return to those allegations in addressing Plaintiff's hostile work environment claim.

21

Plaintiff's allegation of being required to return to work "over the objection of her doctors" or "against medical advice" merits further discussion. Of course, those claims are largely—if not completely—rebutted by the undisputed fact that two medical doctors, including one to whom Plaintiff was referred by her personal therapist, suggested that Plaintiff was fit to return to light duty. Plaintiff agreed in her deposition that those doctors' reports refuted her assertions. In fact, Plaintiff testified that she actually agreed with Dr. Reid's conclusion that she was fit for light duty.

Notwithstanding the doctors' recommendations, it cannot be disputed that Plaintiff's assignment to light duty did amount to a "reassignment with significantly different responsibilities." *Chaudhry*, 546 F.3d at 838. Yet, Plaintiff has made no charge that her light duty responsibilities were "unbearable," or that the reduced duties caused her "skills to atrophy and reduce further career prospects," *Barton*, 662 F.3d at 454, nor has any evidence been introduced to suggest as much. On the contrary, Plaintiff's return to light duty work actually amounted to an *increase* in job duties, rather than a reduction, given that it came upon her return from not working at all. Indeed, the evidence establishes that the KFD was perfectly willing to allow Plaintiff to do more, as Casagrande asked Plaintiff for assistance in a fire investigation before she informed him that she could not.

In sum, Plaintiff has failed to introduce evidence that would allow a reasonable finder of fact to conclude that Schuldt or the City took any discrete or tangible adverse employment action against her.

B. Hostile Work Environment

"When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris*, 510 U.S. at 21 (cleaned up). To survive summary judgment on a hostile work environment claim, a plaintiff must show that: (1) her workplace was both subjectively and objectively offensive; (2) her sex was the cause of the offensive conduct; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability. *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 713 (7th Cir. 2017).

Plaintiff, in her Response to Defendants' motions for summary judgment, never actually argues that she suffered from a hostile work environment. Still, the court discerns that the arguments she does make align with such a claim. For instance, Plaintiff strenuously insists in her Response that she was specifically targeted by Boyce at the Mertens fire because of her sex. Of course, Boyce, as a non-supervisor, had no authority to take any tangible employment action against Plaintiff. However, Boyce's conduct *may* create or contribute to a hostile work environment. See *Velez v. City of Chicago*, 442 F.3d 1043, 1047 (7th Cir. 2006) (employer is liable for hostile work environment where supervisor created said environment or where nonsupervisory co-worker created the hostile work environment and employer was negligent in discovering or remedying the conduct). Further, as discussed above, Plaintiff has alleged multiples instance of conduct by Schuldt or the City that, while not singularly

impacting the terms or conditions of her employment, might be said to have contributed to a hostile work environment.

This brings the court to what is essentially the primary dispute between the parties at this stage of the proceedings: Was Plaintiff's sex the cause for Boyce's attack on her at the Mertens Fire? Or, in summary judgment parlance: Has Plaintiff come forth with evidence sufficient to allow a reasonable trier of fact to conclude that Boyce attacked Plaintiff because of her sex? Such a causal link between the conduct in question and Plaintiff's status as a member of a protected class is an essential element of a hostile work environment claim. *Milligan-Grimstad*, 877 F.3d at 713.

Plaintiff's primary basis for arguing that Boyce's attack was motivated by her sex is that Boyce passed Rabourn in order to attack her. Rabourn's precise positioning leading up to the incident is disputed. Plaintiff and Keller testified that he was part of the group that proceeded past the fire doors to Unit 207 with the uncharged firehose. Rabourn himself and Defendant testified that he was adjusting the fire hose with Rabourn while Plaintiff and only three others proceeded to Unit 207, and that Rabourn was behind Defendant the whole time. McCully also provided similar testimony. At the summary judgment stage, however, this court views the evidence in the light most favorable to Plaintiff, a standard that dictates that her competent evidence is to be believed. *Anderson.* 477 U.S. at 255. Accordingly, for the purposes of this order, the court will assume that Rabourn was among the group that carried the firehose to Unit 207, and that Boyce passed by Rabourn before attacking Plaintiff. The question remains whether those facts are material.

Plaintiff's argument with respect to Rabourn essentially turns Rabourn into a comparator. Plaintiff argues that Rabourn was a male similarly situated to her (in that both were in Boyce's path into Unit 207) who was treated more favorably (in that he was *not* attacked by Boyce).

However, while Rabourn may have been similarly situated *physically*, the similarities end there. "To determine whether employees are similarly situated, courts ask 'whether the other employees' situations were similar enough to the plaintiff's that it is reasonable to infer, in the absence of some other explanation, that the different treatment was a result of'" the plaintiff's membership in a protected class. *de Lima Silva v. Department of Corrections*, 917 F.3d 546, 559 (7th Cir. 2019). To be "similarly situated," coworkers must be directly comparable to the plaintiff in all material aspects, but they need not be identical in every conceivable way. *Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 802 (7th Cir. 2014).

Here, Plaintiff and Rabourn were markedly different in at least one material aspect: their rank. Plaintiff was a lieutenant and the highest-ranking person, other than Boyce, on the second floor at the Mertens fire. The relevance of that distinction is not merely speculative. Plaintiff herself testified at her deposition that she believed Boyce attacked her because she was the ranking person on the scene. That explanation is bolstered by the undisputed fact that the catalyst for Boyce's anger was his belief that his orders had been ignored. In short, there is not an "absence of some other explanation" for Boyce's conduct. *de Lima Silva*, 917 F.3d at 559.

Boyce's bypassing of a solitary male firefighter does not *alone* give rise to a reasonable inference that Boyce attacked Plaintiff with discriminatory intent. Plaintiff argues, however, that the required inference of discriminatory intent is bolstered by evidence showing that "Boyce's own ex-girlfriend . . . had to petition for an Order of Protection against him because he has a 'history of violence.'" Plaintiff's attempt to establish a propensity is unavailing.

The application for an order of protection, taken out nearly five years prior to the Mertens fire incident, named both Boyce's ex-girlfriend and her son as petitioners. On one part of the form, a box was checked as indication that Boyce had "a history of violence." Of course, the "assertion" that Boyce has a history of violence is merely a conclusion, not actual evidence of such a history. See *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996) ("[T]he evidence relied upon [at the summary judgment stage] must be competent evidence of a type otherwise admissible at trial."). More importantly, the application does not indicate or even suggest that Boyce had a history of violence specifically directed at women. While the narrative portion of the application, like Boyce's deposition testimony, indicates that Boyce "got aggressive" with his then-girlfriend while intoxicated at a restaurant, no further details were provided, and there was no allegation of violence or physicality. That Boyce once drunkenly yelled at his girlfriend cannot reasonably be deemed probative of his state of mind during the Mertens fire some five years later.

To be sure, the evidence in this case no doubt establishes that Boyce had a short temper and became outwardly angry with relative frequency. Plaintiff testified that Boyce would push or shove people, including her on one occasion, when they tried to take his keys away from him. Kruse was aware of instances in which Boyce had lost his temper. Boyce's temper was apparently well-known throughout the KFD. Boyce himself recounted an incident in which he slammed his helmet to the floor. More recently, Boyce berated Moy with profanities when he was unhappy with Moy's actions as Union President.

Yet, for all this evidence of Boyce's temper, there is a notable dearth of evidence suggesting any particular propensity for anger, let alone violence, specifically directed at women. See *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 346 (7th Cir. 1999) ("[I]t is undisputed that Anderson was a crude individual who treated all of his coworkers poorly. Thus, it would not be rational for a trier of fact to conclude that Anderson made the workplace less congenial for women or blacks than he did for men or whites.") Rather, the evidence establishes that Boyce was indiscriminate in his anger. The sum of Plaintiff's evidence that Boyce singled her out for attack because of her sex is that Boyce declined to attack one male firefighter he saw sooner, and that Boyce became "aggressive" with a girlfriend five years earlier. A jury could not reasonably infer from this evidence that Plaintiff's sex was the cause of Boyce's conduct at the Mertens fire. See *Milligan-Grimstad*, 877 F.3d at 713.

Absent a showing of discriminatory intent on Boyce's part, Plaintiff is unable to otherwise demonstrate a hostile work environment.

> "To create a hostile work environment, the conduct alleged must be 'sufficiently severe or pervasive to alter the conditions of employment.' Whether conduct meets this bar depends on 'the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance.'"

*Id.* at 714 (quoting *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009)).

Plaintiff's evidence shows that Schuldt forced her to rescind two shift trades in order to avoid working with Boyce, told other KFD supervisors not to talk to her, and insufficiently disciplined Boyce for his conduct at the Mertens fire. The court must consider whether a reasonable jury could find that these instances of conduct combined to create a hostile work environment.

Initially, two of the claims suffer from at least some evidentiary shortfall. Plaintiff testified that she had made trades that would have put her on Boyce's shift on two occasions in November, but she has provided no proof of the actual dates in question. Given that she began taking personal sick time on November 4, 2018, the record lacks evidence that Plaintiff ever actually changed her shifts. With respect to the purported mandate that supervisors were not to speak to Plaintiff, that mandate was apparently undermined almost immediately, when Casagrande informed Plaintiff of it. Plaintiff did not suggest, let alone offer proof, that the mandate was ever carried out.

Regardless of those issues, the conduct alleged simply does not rise to the level required for a hostile work environment claim to survive summary judgment. While Plaintiff would no doubt have been unhappy to learn that she, the victim, was being required to amend her schedule, or that her captain had instructed others not to speak to her, those incidents were "isolated and not particularly severe." *Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005).

Likewise, while Plaintiff had an understandable interest in seeing a severe punishment handed down to Boyce, the lack thereof cannot reasonably be deemed a severe act of harassment toward her. Indeed, the conduct in question here was infrequent and isolated, cannot be deemed "severe," and certainly was not physically threatening or humiliating. Furthermore, the court observes that much more overtly offensive conduct has been found insufficient to support hostile work environment claims. See, *e.g.*, *Scruggs*, 587 F.3d at 841 (allegations that supervisor told employee that she was "made for the back seat of a car" and looked like a "dyke" in combination with other statements did not create a hostile work environment); *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 459-60, 63-64 (7th Cir. 2002) (evidence that supervisor twice gave plaintiff unwelcome back rubs and later stared at her chest during uniform inspection were insufficient to survive summary judgment on hostile work environment claim).

In sum, Plaintiff has failed to marshal evidence that would allow a reasonable jury to conclude that she suffered an adverse employment event, either through a single tangible or discrete action or through the creation of a hostile work environment. Because such a showing is a required element of a sex discrimination claim, summary

judgment is GRANTED in favor of Schuldt and the City with respect to Counts I and XI of the Complaint.

### III. Retaliation (Count XII)

Under Title VII, it is itself an unlawful employment practice for an employer to discriminate against an employee on the basis that she has opposed an unlawful unemployment practice or otherwise made a charge of a Title VII violation. 42 U.S.C. § 2000e-3(a). "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006).

To survive summary judgment on a Title VII retaliation claim, a plaintiff must produce enough evidence for a reasonable jury to conclude that (1) she engaged in a statutorily protected activity; (2) her employer took a materially adverse action against her; and (3) there existed a but-for causal connection between the two. *Abrego v. Wilkie*, 907 F.3d 1004, 1014 (7th Cir. 2018). Notably, the "materially adverse action" requirement is a broader or more flexible standard than the similar requirement in a substantive discrimination claim, such that this court's conclusions regarding those claims do not control the disposition of Plaintiff's retaliation claim. See *White*, 548 U.S. at 66; see also *MacGregor v. DePaul Univ.*, 2010 WL 4167965, at *5 (N.D. Ill. Oct. 13, 2010). In order to show actionable retaliation, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse," meaning that the employer's conduct "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 65 (cleaned up).

With respect to the second element of a retaliation claim, Plaintiff asserts as follows:

> Plaintiff filed an EEOC claim on April 5, 2019. Additionally, Plaintiff was very adamant that the discipline handed down to Defendant Boyce was insufficient. To silence her, Defendants began ignoring the reports and advice from Plaintiff's doctor, requiring her to return to work against medical advice, denying her a formal interview, requiring that she modify her schedule in order to avoid the co-worker that attacked her, and denying her benefits as an employee of Defendant City.

Initially, there is no dispute that Plaintiff's April 5, 2019, filing of an EEOC complaint constituted a statutorily protected activity. However, Plaintiff has presented no evidence that she engaged in a statutorily protected activity *before* that date. While she asserts that she "was very adamant that the discipline handed down to Defendant Boyce was insufficient," she has provided no evidence reflecting that fact. She did not even make such a claim in her own deposition. Moreover, even a complaint about insufficient discipline for Boyce would not amount to opposing an unlawful practice under Title VII, as it contains no reference to sex discrimination. See *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 664 (7th Cir. 2006) (finding that plaintiff's internal complaint about pay discrimination was not a protected activity under Title VII because he failed to "claim that the discrimination resulted from his national origin or his membership in another protected class.").

The timing of Plaintiff's engagement in protected activity undermines some of her claims of retaliatory conduct by Schuldt and the City. Title VII only prohibits discrimination against an employee "*because* he has opposed any practice made an unlawful employment practice" under Title VII. 42 U.S.C. § 2000e-3(a) (emphasis

31

added). It is axiomatic that an employer cannot "retaliate" against an employee for conduct in which the employee has not yet engaged. Plaintiff testified that Schuldt requested in October of 2018 that she amend her schedule to avoid Boyce. That request, which occurred nearly six months before Plaintiff filed her EEOC complaint, cannot be deemed a retaliatory act.

Plaintiff's retaliation claim also suffers the same evidentiary infirmities already discussed. Namely, her claim that she was denied a formal interview regarding the Mertens fire is rebutted by the fact that she *was* interviewed by Bartlett. Similarly, she has introduced no evidence indicating a denial of benefits; rather, Plaintiff admitted in her deposition that each time she used paid sick leave, that time was eventually credited back to her. Finally, Plaintiff's insistence that the City ignored her doctor's advice in requiring her to return to work is affirmatively rebutted by the evidence, which shows that both her own doctor and a doctor provided by the City recommended that Plaintiff could return to light duty—recommendations with which, again, Plaintiff testified that she agreed.

In certain circumstances, a downgrade in work responsibilities may be evidence of materially adverse action in the retaliation context. *White*, 548 U.S. at 71-72. In *White*, for instance, the Supreme Court observed that "[c]ommon sense suggests that one good way to discourage an employee such as White from bringing discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or more agreeable." *Id*. White was reassigned to work as a track laborer—a job described as "arduous" and "dirt[y]"—from her

32

previous assignment as a forklift operator—a position requiring greater qualifications and considered more prestigious. *Id*. at 71. The Court determined that a reasonable jury could conclude that the reassignment was materially adverse. *Id*.

In the instant case, while Plaintiff's light duty responsibilities were certainly not more arduous or demanding than her regular duties as a lieutenant, they no doubt required fewer qualifications and could have been considered less prestigious. Yet, the Supreme Court cautioned in *White* that "whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'" *Id*. (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998)).

Plaintiff was assigned to light duty as an accommodation and on the suggestion of doctors, due to her lingering injuries from the Mertens Fire incident. Indeed, Plaintiff does not argue that the light duty assignment was itself retaliatory; rather, she argues that her being forced to return to work *at all* was retaliatory. But that requirement must also be considered in context. Plaintiff was required to return to work only after two doctors, including one of Plaintiff's own choosing, recommended that she could return to work with light duty accommodations. Given those doctors' recommendations, and Plaintiff's agreement therewith, no reasonable jury could find that the City's return to work requirement was the type of conduct that would dissuade a reasonable worker from making or supporting a charge of discrimination. See *White*, 548 U.S. at 65.

Accordingly, Plaintiff has failed to bring forth sufficient evidence to allow a reasonable jury to conclude that she suffered a materially adverse action, as required to support a claim from Title VII retaliation. Summary judgment in favor of the City is therefore GRANTED with respect to Count XII of Plaintiff's Complaint.

### IV. *Monell* Claims (Counts II and III)

Under the doctrine announced in *Monell v. Dep't of Social Services of the City of New York*, 436 U.S. 658, 694 (1978), direct § 1983 liability may be established against a local governmental body or its policymakers where "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury[.]" *Monell*, 436 U.S. at 694. In determining potential *Monell* liability, the operative inquiry is whether municipal policy or custom was the "moving force [behind] the constitutional violation." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989) (quoting *Monell*, 436 U.S. at 694).

At bottom, a *Monell* claim must allege "an underlying constitutional violation" stemming from an official policy or custom. See *Coleman v. City of Peoria*, 925 F.3d 336, 351 (7th Cir. 2019). "If the plaintiff fails to prove a violation of his constitutional rights in his claim against the individual defendants, there will be no viable *Monell* claim based on the same allegations." *Swanigan v. City of Chicago*, 775 F.3d 953, 962 (7th Cir. 2015); *Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 504 (7th Cir. 2010) ("[A] municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee.").

Plaintiff has raised *Monell* claims against Schuldt (Count II) and the City (Count III) based on violations of the Second, Fourth, and Fourteenth Amendments. In the memorandum in support of their Motion to Dismiss (#14), Schuldt and the City urged that this court should dismiss the *Monell* claims because "the Second and Fourth Amendments have nothing to do with this case." The court agreed that there were "no allegations that relate to liability under the Second and Fourth Amendments," but found that this was not grounds for dismissal.

In her Response to the motions for summary judgment, Plaintiff asserts that she "has a Fourth Amendment claim under the *Monell* theory. Had Defendant Boyce not singled her out for her gender, that cause of action would remain." Even more confoundingly, Plaintiff wrote in her memorandum opposing Schuldt's and the City's Motion to Dismiss that "Plaintiff acknowledges that the brief mention of the Second and *Fourteenth* Amendments, without further discussion, was an administrative error." (Emphasis added.)

The court need not go to any great lengths to decipher the precise parameters of Plaintiff's claims. She has introduced no evidence that would allow a rational jury to conclude that she suffered a deprivation of her rights under the Second or Fourth Amendment. Furthermore, Plaintiff's *Monell* claims also fail insofar as they are premised upon a violation of the Equal Protection Clause of the Fourteenth Amendment, given that this court has granted summary judgement with respect to that claim. See *Sallenger*, 630 F.3d at 504.

The court notes that Plaintiff's resort to the so-called "single incident" theory of municipal liability does not impact this conclusion. While that theory absolves a plaintiff of the duty of demonstrating a pattern of violations, ordinarily required under *Monell*, it does not dispense with the obligation of showing an original underlying constitutional injury. See *City of Canton*, 489 U.S. at 390 (where need for certain policy is so obvious, the lack thereof "may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable *if it actually causes injury*.") (emphasis added); see also, *e.g.*, *Connick v. Thompson*, 563 U.S. 51, 64-64 (2011).

Summary judgment in favor of Schuldt and the City is therefore GRANTED with respect to Counts II and III of Plaintiff's Complaint.

### V. State Law Claims (Counts IV, V, VI, IX, X, XIII, XIV, XV, and XVI)

Following the granting of summary judgment in favor of Defendants on Counts I, II, III, XI, and XII, the remaining claims in Plaintiff's Complaint are each brought under the laws of the State of Illinois. The court's subject matter jurisdiction in this case arises under 28 U.S.C. § 1331, federal question jurisdiction. The court does not have diversity jurisdiction under 28 U.S.C. § 1332, as Plaintiff is a citizen of Illinois and does not allege that any Defendant is a citizen of any other state. The court's jurisdiction over Plaintiff's state law claims, therefore, arises under 28 U.S.C. § 1367, supplemental jurisdiction. Under that statute, in any civil action in which the district court has original jurisdiction, it shall also have jurisdiction over all other claims forming the same case or controversy. *Id*. § 1367(a).

Where the district court has dismissed all claims over which it has original jurisdiction, it "may decline to exercise supplemental jurisdiction" over the remaining claims. *Id*. § 1367(c)(3). This decision is committed to the sound discretion of the district court, and in cases such as this one where the district court disposes of the federal claims before trial, the Seventh Circuit will reverse the district court's decision to relinquish supplemental jurisdiction over state law claims "only in extraordinary circumstances." *In re Repository Technologies, Inc.*, 601 F.3d 710, 724-25 (7th Cir. 2010), (quoting *Contreras v. Suncast Corp.*, 237 F.3d 756, 766 (7th Cir. 2001)). Indeed, when all federal claims in a suit are dismissed before trial, there is a "presumption" that the court will relinquish supplemental jurisdiction over the supplemental state law claims. *RWJ Management Co., Inc. v. BP Products North America, Inc.*, 672 F.3d 476, 479 (7th Cir. 2012).

The court finds that the presumption in favor of relinquishing supplemental jurisdiction over the state law claims should be applied in this case. See *id*. (observing that the presumption "should not be lightly abandoned" (internal quotation marks omitted)). In so finding, the court notes that neither party has taken a position with respect to the discretionary exercise of supplemental jurisdiction. The court therefore relinquishes supplemental jurisdiction over the state law claims found in Counts IV, V, VI, IX, X, XIII, XIV, XV, and XVI of Plaintiff's Complaint and dismisses those claims without prejudice.

IT IS THEREFORE ORDERED THAT:

(1) Summary Judgment is GRANTED in favor of Defendants Damon Schuldt and the City of Kankakee on Counts I and XII of the Complaint

(2) Summary Judgment is GRANTED in favor of Defendant City of Kankakee on Counts III and XI of the Complaint.

(3) Summary Judgment is GRANTED in favor of Defendant Damon Schuldt on Count II of the Complaint.

(4) The Court relinquishes supplemental jurisdiction over the remaining counts in the Complaint.

(5) Counts IV, V, VI, IX, X, XIII, XIV, XV, and XVI of the Complaint are dismissed without prejudice for lack of jurisdiction.

(6) Defendants Damon Schuldt and the City of Kankakee's Motion for Summary Judgment (#44) with respect to Counts V, VI, X, XIV, XV, and XVI of the Complaint is DENIED as MOOT.

(7) Defendant Nathan Boyce's Motion for Summary Judgment (#46) is DENIED as MOOT.

ENTERED this 9th day of May, 2022.

s/Colin Stirling Bruce
COLIN S. BRUCE
U.S. DISTRICT JUDGE

38